**Opinion issued October 13, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00668-CR

———————————

**CHARLES LYNCH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Case No. 15-CR-3172**

---

# O P I N I O N

Charles Lynch appeals his conviction for possession with intent to deliver between 4 and 200 grams of cocaine, for which he was sentenced to 45 years' imprisonment. *See* TEX. HEALTH & SAFETY CODE §§ 481.102(3)(D), 481.112(a), (d). In four issues, he contends that the trial court abused its discretion by admitting two

extraneous offenses in the form of penitentiary packets and by admitting hearsay testimony regarding who lived in the house where a search warrant was executed. We hold that the trial court abused its discretion in admitting the extraneous offenses because they were more prejudicial than probative. Because the error affected Lynch's substantial rights, we reverse the judgment and remand to the trial court.

## Background

Lynch was indicted for possession with intent to deliver between 4 and 200 grams of cocaine. He pleaded not guilty and proceeded to a jury trial. At trial, the State called three witnesses: (1) the police officer who executed a search warrant, (2) a detective who attempted to obtain cell phone data from Lynch's phone, and (3) a chemist who tested the drugs recovered at the scene. Lynch called one witness, Tina Moreno, another occupant of the house.

Sergeant F. Gandy of the La Marque Police Department testified that he conducted a narcotics investigation that focused on Lynch as a suspect. Sergeant Gandy obtained a search warrant for Lynch's residence and an arrest warrant for Lynch. In September 2015, officers went to Lynch's residence to execute the warrants. The residence was a garage that had been converted into a one-bedroom apartment. Police forced their way in after nobody answered the door. Officers discovered four occupants inside the house: Lynch, Moreno, Phillip Darden, and Norma Myers. Sergeant Gandy believed that Lynch was the only permanent resident

2

of the house and the other occupants "visited in some form or fashion." Lynch told Sergeant Gandy that all four occupants had access to the house and lived there. Sergeant Gandy discovered crack cocaine on a dresser in the bedroom, some of which was resting on a cell phone. He also found a knife and cash on a dresser and plastic baggies with the corners torn off in the trash can. Sergeant Gandy testified that about 7 grams of crack cocaine was found, which was close to a quarter of an ounce. The State showed the jury photos that law enforcement took of the apartment and their discoveries.

On cross-examination, Sergeant Gandy testified that some of the evidence had been moved before it was photographed. For example, plastic baggies were placed on top of the stove in the kitchen and on top of the dresser in the bedroom to facilitate photographs, but the baggies were not in those positions when the officers arrived. Sergeant Gandy also clarified that all four occupants said that Moreno lived in the house with Lynch. Moreno's prescription medicine was found in the bedroom. Sergeant Gandy agreed that a pink bottle of Hello Kitty perfume found in the bathroom likely belonged to a woman. He declined to speculate about whether other products in the bathroom and shower belonged to a woman or a man. Sergeant Gandy admitted that, while Moreno stated that the drugs were hers, she was not arrested or investigated beyond searching her cellphone. According to the State's

3

photographs, her cellphone was found plugged into a pink phone charger next to the bed.

While Sergeant Gandy was testifying, the defense played a recording of his interview with Moreno. The interview occurred immediately after the search warrant was executed and took place in the living room. During the interview, Moreno told the officers that she had lived at the house for a few months. She stated that the drugs in the bedroom belonged to her and that she sold and used crack cocaine. She claimed to have a "quarter" of cocaine that she valued at approximately $225. Once the officers told her that claiming that the drugs were hers would not prevent Lynch from being arrested and that she could be charged with a first-degree felony, Moreno said that the drugs were not hers. She said that she initially said the drugs belonged to her because she did not want Lynch to be arrested. Moreno also denied selling drugs from the residence. She told officers that the cell phone on top of the dresser belonged to Lynch and that she had seen him sell drugs from the house in the past. Sergeant Gandy testified that, even though Moreno claimed the drugs were hers, she was not arrested because he did not believe her. He did not think she demonstrated enough knowledge to be a street-level drug dealer, and he had not seen her at the house during surveillance.

Detective G. Groce of the Galveston Police Department, whose specialty was extracting information from cell phones and computers, testified that he attempted

4

to extract information from Lynch's phone but could not do so because it was password protected. He was able to extract information from Moreno's phone.

A chemist with the Department of Public Safety testified that he tested the suspected controlled substance found on the scene. The sample he tested weighed more than four grams, and since the highest penalties attach to drug weights over four grams, he did not test all of the substance recovered to find the total weight. He determined that the substance was cocaine. The State rested after the chemist's testimony.

Lynch called Tina Moreno to testify. Moreno said that she was called to testify because drugs found in the house belonged to her. She stated that Lynch did not know about the drugs, nor did he know that she was using and selling them. Moreno testified that Lynch would not approve of her using drugs in the house. She testified that the crack cocaine, plastic baggies, and knife found in the house belonged to her.

Moreno read an affidavit that she swore to on the day after the search. In the affidavit, she stated that all of the controlled substances in the house belonged to her. When she wrote the affidavit, she did so on her own, without counsel. While testifying, she stated that she was lying when she told police on the day of the search that the drugs were not hers. She testified that officers intimidated her when they told her she would go to jail and scared her into saying that the drugs were Lynch's when they were not. She wrote the affidavit the next day to clear up the confusion.

Moreno also read a second affidavit that she had signed. It stated that she had lived at the house for a few months, and she had used cocaine for several years. On the day of the search, she purchased some cocaine and brought it to the house. Lynch did not know about the purchase because she had led him to believe that she no longer used crack cocaine. In the affidavit, she stated that she shared a bedroom with Lynch, and when she went into the bedroom to change her clothes, she placed her belongings on the dresser, including the crack cocaine. She meant to pick up her things, including the cocaine, but it slipped her mind. She averred that the coin purse found on the dresser and its belongings, which were little bags of crack cocaine, a $20 bill, and a $10 bill, belonged to her. Moreno testified that her statements in the affidavit were true. She also testified that she had criminal convictions stemming from her history of drug use.

On cross-examination, Moreno stated that she had been released from prison in June of 2015, and between June and September, when the house was searched, she stole to get money to buy drugs. On the day before the search she had purchased a quarter of an ounce of crack cocaine for $225 from a house in La Marque. She intended to smoke it at the house while Lynch was gone. She also had smaller amounts of cocaine in a pouch. Moreno testified that while her primary mailing address was her mother's house, she went back and forth between Lynch's house

6

and her mother's house. She kept clothes at Lynch's house and spent about 30 percent of her time there.

The State introduced text conversations between Lynch and Moreno that occurred a few weeks before the search. They showed that Moreno texted Lynch asking him to bring her "something to smoke." Moreno testified that she was asking Lynch to bring her cigarettes because she did not have money to buy them. She also texted Lynch in early September, thanking him for all that he had done for her and apologizing for "the way things turned out" between them. She told Lynch that she loved him but that she was "in her addiction." She testified that she meant her addiction to crack cocaine and cigarettes. After Moreno's testimony, Lynch rested.

The State then sought to introduce rebuttal evidence, in the form of penitentiary packets ("pen" packets), showing that Lynch had four prior convictions: possession of methamphetamine in 1990, two convictions for possession with intent to deliver cocaine in 2006, and possession of cocaine in 2006. The State argued that Moreno's testimony had rebutted all of the State's evidence of Lynch's intent because Moreno stated that the crack cocaine, knife, and baggies belonged to her. Lynch responded that the convictions were not evidence of intent because there was no testimony or evidence to show a distinctive, common characteristic between the previous cases and the underlying allegations. Pen packets did not prove that Lynch had similar motive, means, or intent. Lynch argued that without direct testimony or

some other evidence, the extraneous offenses were more prejudicial than probative, allowing the jury to convict based on bad character. Lynch also argued that the possession cases were not sufficiently similar because the underlying offenses did not have the same elements as the charged offense.

The court allowed the State to introduce the two convictions for possession of a controlled substance with intent to deliver between 4 and 200 grams of cocaine from 2006 and excluded the other two convictions. The pen packets containing the two convictions were admitted and published to the jury. The court instructed the jury that they could use them as rebuttal evidence to Lynch's defensive theory and could consider them to show Lynch's "intent, motive, opportunity, preparation, plan, absence of mistake or accident, or knowledge, if any."

The jury found Lynch guilty of possession with intent to deliver cocaine. He pleaded true to an enhancement, and the court sentenced him to 45 years' imprisonment.

**Extraneous Offenses**

In two issues, Lynch contends that the trial court abused its discretion in admitting evidence of his two prior convictions for possession with intent to deliver. He argues that the pen packets did not include details demonstrating their similarity to the underlying case, allowing the jury to convict based on bad character. He also

argues that without detail, the probative value of the convictions was substantially outweighed by their unfair prejudicial effect. We agree.

## A.    Background

The State introduced the extraneous offense evidence through pen packets, containing only the judgments and indictments for the two offenses. The indictment language tracked the statutory language for the offenses and did not offer particular details of the underlying conduct. The State sought to admit the convictions to rebut Moreno's testimony that the drugs belonged to her. Specifically, the State argued that the convictions showed intent and absence of mistake. Lynch objected that the State could not use the convictions to show conformity, that they were too remote from the underlying case, and that their probative value was outweighed by their prejudicial effect. He also objected that the evidence lacked detail showing similar characteristics between the present case and the prior cases. Over Lynch's objections, the court allowed the two convictions in the form of pen packets to be introduced.

When the State introduced the pen packets, the court instructed the jury that the convictions were offered "as rebuttal evidence to the Defendant's defensive theory of this case. This evidence may only be considered to show, if it does, the Defendant's intent, motive, opportunity, preparation, plan, absence of mistake or accident, or knowledge, if any." The court instructed that the evidence could not be

considered as character evidence and or used as evidence that "on this particular occasion, the Defendant acted in accordance with that alleged character trait, if any." Immediately after the admission of the pen packets, both sides rested. The jury charge included a similar limiting instruction for the jury stating:

> [The extraneous offense] evidence was admitted only for the purpose of assisting you, if it does, for the purpose of showing the defendant's motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident, if any. You cannot consider the testimony unless you find and believe beyond a reasonable doubt that the Defendant committed these acts, if any, were committed.

## B. Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). The erroneous admission of extraneous offense evidence constitutes non-constitutional error. *Hernandez v. State*, 176 S.W.3d 821, 824 (Tex. Crim. App. 2005); *see also* TEX. R. APP. P. 44.2(b). Under rule 44.2, we must disregard "any [non-constitutional] error, defect, irregularity, or variance that does not affect substantial rights." TEX. R. APP. P. 44.2. We will uphold a trial court's evidentiary ruling if it was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

10

## C.    Applicable Law

"Relevant evidence is generally admissible, irrelevant evidence is not." *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018) (citing TEX. R. EVID. 402). "Evidence is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. "Evidence does not need to prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence." *Gonzalez*, 544 S.W.3d at 370. "A 'fact of consequence' includes either an elemental fact or an evidentiary fact from which an elemental fact can be inferred." *Henley v. State*, 493 S.W.3d 77, 84 (Tex. Crim. App. 2016).

Evidence of other crimes may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." TEX. R. EVID. 404(b). It is not admissible to prove the "character of a person in order to show that he acted in conformity therewith." *Id.* Before extraneous offense evidence can be admitted, it must also satisfy the balancing test established in Rule of Evidence 403, which states that evidence is admissible if and only if its probative value is not substantially outweighed by its unfair prejudicial effect. TEX. R. EVID. 403; *see Gigliobianco v. State*, 210 S.W.3d 637, 640 (Tex. Crim. App. 2006); *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1990).

When conducting a Rule 403 analysis, a court must balance the probative force of and the proponent's need for the evidence against the risk of unfair prejudicial effect. *Gonzalez*, 544 S.W.3d at 372. Specifically, the court must consider (1) any tendency of the evidence to suggest decision on an improper basis; (2) any tendency of the evidence to confuse or distract the jury from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the likelihood that the presentation of the evidence will amount to undue delay. *Gigliobianco*, 210 S.W.3d at 641–42. The probative force of the evidence refers to how strongly it serves to make the existence of a fact of consequence more or less probable. *Gonzalez*, 544 S.W.3d at 372. We will uphold a trial court's ruling on a Rule 403 balancing test, whether explicit or implied, if it is within the "zone of reasonable disagreement." *Jamari v. State*, 273 S.W.3d 745, 753 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *see also Martinez*, 327 S.W.3d at 736 (when reviewing the trial court's determination of probative and prejudicial value of evidence under Rule 403, appellate courts reverse only upon showing of clear abuse of discretion).

## D.    Admissibility of pen packets

Preliminarily, to the extent the State sought to rebut Moreno's testimony that Lynch would not have approved of her use of cocaine, the extraneous offenses were improper evidence to do so. The Texas Court of Criminal Appeals has explained that

12

when a witness presents a picture that an accused is not the type of person to commit a certain type of offense, the State "may impeach that witness' testimony by cross-examining the witness concerning similar extraneous offenses." *Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002). However, "[t]he evidentiary caveat . . . is that the opponent must correct the 'false impression' through cross-examination of the witness who left the false impression, *not* by calling other witnesses to correct the false impression." *Id.* The State did not introduce the offenses as impeachment during Moreno's testimony. Instead, the State sought to introduce additional evidence after Moreno's testimony of prior bad acts. Even assuming that Lynch left a false impression with the jury by eliciting testimony from Moreno that he was not the type of person to possess cocaine, the State would only have been "entitled to rebut that 'false impression' inference with cross-examination questions [of Lynch's witness] concerning allegations of similar misconduct." *Id.* at 885–86. Here, however, the State did not attempt to correct any false impression by cross-examination of Moreno. Rather, the State attempted to correct the false impression through evidence, without testimony, of Lynch's other crimes.

Even assuming the extraneous offense pen packets were relevant for some other purpose, the trial court erred in admitting them because their probative value is substantially outweighed by a danger of unfair prejudice and confusing the issues. TEX. R. EVID. 403. The probative value of this particular evidence was low.

13

*Gigliobianco*, 210 S.W.3d at 641 (Rule 403 analysis must balance inherent probative force against prejudicial tendencies). The pen packets containing the two convictions showed only that on two previous occasions in 2006 Lynch had been convicted of possession with intent to deliver cocaine and was sentenced to imprisonment. Remoteness and similarity are important factors for judging the probative value of offered extraneous offenses. *Plante v. State*, 692 S.W.2d 487, 491 (Tex. Crim. App. 1985) (stating if there are sufficient common distinguishing characteristics between the extraneous offense and the primary offense such that the probative value of the evidence outweighs its prejudicial value, then the court may admit the evidence to prove certain elements of the crime). But here, the State did not introduce any associated testimony or details to demonstrate similarity between the circumstances of the prior convictions and the facts of the alleged offense. According to the pen packets, the two extraneous offenses occurred in 2004 and 2006, not near the time of the 2017 events recounted at trial. The record does not include whether the convictions occurred under circumstances similar to the State's theory in this case.

The Court of Criminal Appeals has recognized that:

> "[T]here will always be similarities in the commission of the same type of crime. That is, any case of robbery by firearms is quite likely to have been committed in much the same way as any other. What must be shown to make the evidence of the extraneous crime admissible is something that sets it apart from its class or type of crime in general, and marks it distinctively in the same manner as the principal crime.

14

*Ford v. State*, 484 S.W.2d 727, 730 (Tex. Crim. App. 1972); *see also Smith v. State*, 420 S.W.3d 207, 220–22 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (upholding admission of evidence of robbery "substantially similar" to the charged offense to prove intent to commit robbery when both incidents involved same accomplice and defendant approaching unsuspecting person in a parking lot, and incidents occurred within three weeks of each other); *Prince v. State*, 192 S.W.3d 49, 54–5 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (upholding admission of evidence of two "sufficiently similar" extraneous offenses to prove intent when the offenses were committed with a blunt instrument or knife, no property was taken from store clerk, and defendant drove away quickly); *Johnson v. State*, 932 S.W.2d 296, 302–03 (Tex. App.—Austin 1985, pet. ref'd) (upholding admission of extraneous aggravated assault to prove intent because both offenses involved defendant shooting at individuals in car early in morning while accompanied by same person, who also used shotgun, and attempts to prevent escape of other individuals).

There is no evidence that Lynch used the same means to possess the drugs or that he possessed a similar amount. *Cf. Blackwell v. State*, 193 S.W.3d 1, 14 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (extraneous offenses introduced for purposes of proving intent were similar because they showed defendant used same means to entice young boys to be alone with him, gave them gifts, took them to same

place, told them to take their clothes off, threatened them in similar ways, and only differences were the type of sexual contact); *see also Plante*, 692 S.W.2d at 493–94 (extraneous transactions were similar to charged offense of theft by deception because all involved sale of goods or services on credit induced by appellant's unfulfilled promise to pay later, were billed to same company, and were not returned).

To the extent the evidence proved intent, it did so by suggesting that Lynch necessarily intended to commit the charged offense because he was a person who commits possession with intent to deliver in general, and therefore was more likely to have possessed cocaine on the date in question. *But see* TEX. R. EVID. 404(b)(1) (evidence of a crime is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character); *see also Gigliobianco*, 210 S.W.3d at 641 (court must balance tendency of evidence to suggest decision on an improper basis); *Webb v. State*, 36 S.W.3d 164, 181 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) ("In other words, proof of the sexual assault against Porter served no probative function other than to show appellant as a person who commits sexual assault in general, and therefore was more likely to have committed the sexual assault against Baird, an inference rule 404(b) strictly forbids.").

In contrast to the low probative value, the risk of unfair prejudice was very high, with a risk that the jury would decide on an improper basis. *Gigliobianco*, 210 S.W.3d at 641. This *Gigliobianco* factor weighs heavily against the admission of the extraneous offenses. *Id.* The purpose of Rule 404(b) is to protect a defendant from the "undue prejudice" that "when evidence is received that accused is of a wicked or criminal disposition, juries are likely to find him guilty of the offense charged regardless of whether it is proved by the evidence." *Robbins v. State*, 88 S.W.3d 256, 263 (Tex. Crim. App. 2002) (quoting 2 Ray and Young, *Texas Law of Evidence* (2d ed., 1956), § 1492). Evidence of other crimes may create unfair prejudice if a jury would be more likely to draw an impermissible character conformity inference than the permissible inference for which the evidence is relevant or if the evidence otherwise distracts the jury and invites them to convict on a moral or emotional basis rather than as a reasoned response to the relevant evidence. *Hankton v. State*, 23 S.W.3d 540, 547 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd).

While all extraneous offenses are inherently prejudicial, the admission of pen packets stating only the two convictions, standing alone and without context, is unusually prejudicial. In this case, the jury could have decided that the evidence demonstrating that the drugs belonged to Lynch rather than Moreno was equivocal. The jury did not hear evidence that police had observed Lynch distributing drugs during their surveillance of his home. There was no evidence of trash pulls or

17

controlled buys. The only evidence introduced to support the inference that the drugs belonged to Lynch was that he lived in the house and had been surveilled generally by the La Marque Police Department, and drugs were found on his dresser and his cell phone. But the jury also heard from Moreno that the drugs were hers. The jury heard evidence that she had access to the bedroom where the drugs were found. And Sergeant Gandy admitted that drug paraphernalia found in the house was moved prior to being photographed, casting doubt on the exact locations of the drugs, knife, and baggies when officers arrived.

Given the state of the evidence, the State's introduction of the two convictions had significant potential "to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The convictions allowed the jury to believe Lynch was a criminal in general, and therefore, probably committed the charged offense, a conclusion the State emphasized in closing argument, stating:

> The reason why I entered [the extraneous offense convictions] was because Ms. Moreno gets on the stand and pretty much says 'Hey, I ran this whole operation under his nose. He had no knowledge, no intent. He wouldn't go for that. Pretty much, he's a saint. He doesn't want any of that in his house.' So to rebut that, I brought you: Well he's not above having cocaine in his possession; and in fact, cocaine, with possession and the intent to deliver. The same exact reason why we're here today.

18

In addition to allowing the jury to decide on an improper basis that Lynch was a criminal in general, the evidence also had the tendency to confuse or distract the jury by allowing them to focus more acutely on Lynch's criminal history than the evidence and main issues of the underlying case. *See Gigliobianco*, 210 S.W.3d at 641.

The prejudicial effect can be reduced by the trial court's limiting instructions, but the instruction did not do so. The State argued that it sought to admit the evidence to rebut a defensive theory and show absence of mistake, but the jury charge allowed the jury to consider the offenses for a broad range of purposes. The jury charge stated:

> [The extraneous offense] evidence was admitted only for the purpose of assisting you, if it does, for the purpose of showing the defendant's **motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident**, if any. You cannot consider the testimony unless you find and believe beyond a reasonable doubt that the Defendant committed these acts, if any[] were committed.

(emphasis added).

While the potential inference of character conformity can be held in check by a limiting instruction, this limiting instruction allowed the jury to use the extraneous offense information for more reasons than those for which the State sought to admit it. *See McGregor v. State*, 394 S.W.3d 90, 121 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (holding limiting instruction reduced risk of inference of character

conformity). The laundry list of reasons to use the extraneous offenses given in the limiting instructions could have only served to confuse the jury. *See Gigliobianco*, 210 S.W.3d at 641; *DeLeon v. State*, 77 S.W.3d 300, 316 (Tex. App.—Austin 2001, pet. ref'd). The instruction did not lessen the potential for unfair prejudice in this case. *Cf. Le v. State*, 479 S.W.3d 462, 472 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). When combined with the State's closing argument, the risk for unfair prejudice was high.

The jury did not hear evidence that would demonstrate that the circumstances of the previous convictions were similar or related to the circumstances of the underlying case, and the jury did not receive a limited instruction for using the convictions. The second factor and third *Gigliobianco* factors weigh against admissibility of the evidence. *See Gigliobianco*, 210 S.W.3d at 641.

The fourth factor, the likelihood that the presentation of the evidence amounts to undue delay, weighs in favor of admitting the evidence. *Id.* at 642. Since the State only admitted documents, rather than testimony of the convictions, it did not take long to introduce to the jury.

Balancing the prejudicial nature of the offenses with the State's need for the evidence to prove intent weighs against the admission of the extraneous offense evidence. *Id.* at 641 (court must balance probative force and State's need for evidence against prejudicial effect). Intent may be inferred from circumstantial

evidence. *Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996). To the extent the State sought to rebut Moreno, we have explained how the convictions were improper evidence to do so. Introducing the convictions, without details that would give the jury perspective as to whether they were similar to this situation or not, served little purpose other than to prove character conformity. *See Montgomery*, 810 S.W.2d at 391 ("The trial judge must conclude that the evidence tends in logic and common experience to serve some purpose other than character conformity to make the existence of a fact of consequence more or less probable than it would be without the evidence.").

Because the extraneous offense evidence consisted only of convictions in the form of pen packets, without additional evidence to guide the jury to conclude that the circumstances of the convictions were similar to the alleged conduct, the probative value of the extraneous offense evidence was so substantially outweighed by the danger of unfair prejudice that it was a clear abuse of discretion to admit them. *See Jamari*, 273 S.W.3d at 753; *Martinez*, 327 S.W.3d at 736.

### E. Harm Analysis

Next, we must determine whether the error is reversible. When considering a non-constitutional error, we must disregard the error unless it affects a substantial right. TEX. R. APP. P. 44.2(b). An error affects a defendant's substantial rights only when the error had a substantial and injurious effect or influence on the jury's

21

verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *Robinson v. State*, 236 S.W.3d 260, 269 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). If the error had only a slight influence on the verdict, the error is harmless. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Important factors include the nature of the evidence supporting the verdict, the character of the alleged error, and how the error might be considered in connection with other evidence in the case. *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003); *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). "Specifically, the reviewing court should consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert." *Motilla*, 78 S.W.3d at 357.

The United States Supreme Court has explained:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (adopting test from and citing *Kotteakos*, 328 U.S. at 764–65); *see also Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). The

U.S. Supreme Court has defined "grave doubt" to mean "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995); *Webb v. State*, 36 S.W.3d 164, 182–83 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (quoting *O'Neal*, 513 U.S. at 435). If the reviewing court is unsure whether the error affected the outcome, the court should treat the error as harmful, i.e., as having a substantial and injurious effect or influence in determining the jury's verdict. *O'Neal*, 513 U.S. at 435; *Webb*, 36 S.W.3d at 182–83.

The defendant is not required to prove harm from an error. *Johnson*, 43 S.W.3d at 4. Indeed, there ordinarily is no way to prove "actual" harm. *Id.* It is instead the duty of the reviewing court to assess harm from the context of the error. *Id.* The proper inquiry is whether the trial court's error in allowing the State to introduce pen packets with Lynch's extraneous offenses substantially swayed or influenced the jury's verdict, or whether we are left in grave doubt as to whether the extraneous offense evidence substantially swayed or influenced the jury's verdict. *Kotteakos*, 328 U.S. at 765; *Johnson*, 43 S.W.3d at 4. In making this determination, we consider the trial court's erroneous admission of the extraneous offense in the context of the entire record, and not just whether there was sufficient or overwhelming evidence of the defendant's guilt. *Motilla*, 78 S.W.3d at 355–56.

23

Here, the extraneous offense evidence undoubtedly swayed the jury's decision. We have previously explained how the character of the erroneously admitted evidence was especially prejudicial. The pen packets were official documents, leaving little room for interpretation by the jury. The strongest piece of evidence the State had against Lynch was that he had previously been convicted under similar statutes on two occasions.

The State emphasized the erroneously admitted evidence in its closing argument, referencing the prior convictions and stating that Lynch had been convicted of being a drug dealer in the past and that is the "same exact reason why we are here today." The State's argument gave the jury the impression they could convict Lynch of being a drug dealer, generally. The laundry list of reasons to use the extraneous offenses given in the limiting instructions could have only served to confuse the jury. *DeLeon v. State*, 77 S.W.3d 300, 316 (Tex. App.—Austin 2001, pet. ref'd).

Extraneous offense evidence can have a devastating impact on the jury's rational disposition towards other evidence because of the jury's natural inclination to infer guilt to the charged offense from the extraneous offenses. *See Abdnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994); *Mayes v. State*, 816 S.W.2d 79, 86 (Tex. Crim. App. 1991). Given that the extraneous offense evidence was inherently prejudicial and possessed low probative value, and considering the record

as a whole and the State's emphasis on the extraneous offense in closing argument, it appears the offenses were presented to improperly bolster the State's case. We cannot say with fair assurance that the erroneous admission of the offenses had only a slight influence on the jury or that their admission did not affect Lynch's substantial rights. TEX. R. APP. P. 44.2(b); *Johnson*, 967 S.W.2d at 417. Accordingly, we hold that the erroneous admission of the extraneous offenses resulted in reversible error.

Lynch's two issues related to the extraneous offenses are sustained. Consequently, we need not reach his remaining issues. TEX. R. APP. P. 47.1.

## Conclusion

We reverse the judgment of the trial court and remand for further proceedings.

Peter Kelly
Justice

Panel consists of Justices Keyes, Lloyd, and Kelly.

Publish. TEX. R. APP. P. 47.2(b).

25